INTERNATIONAL CUSTOM
PRODUCTS, INC.,
Plaintiff,

v.

UNITED STATES, Defendant.

Slip Op. 12–140.
Court No. 07–00318.

United States Court of
International Trade.

Nov. 20, 2012.

1. This action was consolidated with portions of the complaints from Court Nos. 12–00009, 12–00017, and 12–00022. Order, Apr. 5, 2012, ECF No. 50.

Eckert Seamans Cherin & Mellott, LLC (Gregory H. Teufel and Jeremy L.S. Samek), Pittsburgh, PA, for Plaintiff.

Stuart F. Delery, Assistant Attorney General; Jeanne E. Davidson, Director, Washington, DC; Barbara S. Williams, Attorney–in–Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Edward F. Kenny, New York, NY, and Jason M. Kenner); Yelena Slepak, Office of the Assistant Chief Counsel, Int'l Trade Litigation, U.S. Customs and Border Protection, of counsel, for Defendant.

### OPINION & ORDER

CARMAN, Judge:

Following a bench trial held from February 6, 2012 to February 10, 2012, this matter is now before the Court for findings of facts, conclusions of law, and entry of judgment. Upon considering and

weighing the evidence on the trial record, the Court finds that Plaintiff, International Custom Products, Inc. ("ICP"), has proven that the product it imported in the entry underlying this case, called "white sauce," conformed to a properly obtained binding ruling letter, D86228 (the "Ruling Letter"), issued by the New York office of the Bureau of Customs and Border Protection ("CBP" or "Customs") on January 20, 1999. Because the Ruling Letter, which had not been properly revoked, controlled the tariff classification of ICP's white sauce, the Court finds that CBP acted contrary to law in liquidating the entry under a different tariff classification associated with a much higher tariff rate. As a consequence, the Court will issue a partial final judgment pursuant to USCIT Rule 54(b),[1] requiring Customs to reliquidate the single entry of Plaintiff's merchandise underlying this suit at the rate established by the Ruling Letter and to refund to Plaintiff any overpayment with interest as provided by law.

## I. PROCEDURAL BACKGROUND OF CASE

Litigation between Plaintiff and the government over the liquidation rate of entries of Plaintiff's white sauce has been ongoing since 2005. It was on April 18, 2005 that Customs issued a Notice of Action which had as its result that 100 entries (the "Affected Entries") of ICP's white sauce were reclassified under 0405.20.3000, HTSUS, for "[b]utter and ... dairy spreads," rather than as "[s]auces and preparations therefor" under 2103.90.9091, HTSUS (the 2005 analog of 2103.90.9060, HTSUS, which was the subheading provided for in the 1999 Ruling Letter). The Notice of Action stated that

"action has been taken" to rate-advance the Affected Entries, and that in the future, "all shipments of this product must be classified" under 0405.20.3000, HTSUS. The consequence of the reclassification was an increase of approximately 2400% in the duties owed by ICP. Since 2005, ICP has sought relief in various forms from the Notice of Action.

### A. Overview of ICP Cases

Customs's reclassification of ICP's white sauce has spawned a number of lawsuits. A brief overview of that litigation is appropriate here to provide the context within which the current case arises.

#### 1. The 2005 Case

Challenges to tariff classification are typically brought before this court under 28 U.S.C. § 1581(a). However, in its 2005 suit (Court No. 05–00341), ICP asserted jurisdiction under the Court's residual jurisdictional statute, 28 U.S.C. § 1581(i)(4). The Court may not exercise § 1581(i) jurisdiction when the plaintiff can access the court "by traditional means, such as under § 1581(a)," unless "the remedy provided under [subsection (a) ] would be manifestly inadequate." *Thyssen Steel Co. v. United States*, 13 CIT 323, 328, 712 F.Supp. 202, 206 (1989). This Court determined that a suit brought pursuant to § 1581(a) would be manifestly inadequate because ICP was challenging not the "classification of its white sauce as enunciated in the Notice of Action," but rather "the Notice of Action itself and Customs's authority to issue it." *International Custom Products, Inc. v. United States*, 29 CIT 617, 622, 374 F.Supp.2d 1311, 1320 (2005) ("*ICP I*"). This Court also found that ICP's remedy

---

**1.** USCIT Rule 54(b) permits the Court to "direct entry of a final judgment as to one or more, but fewer than all, claims" where the Court "expressly determines that there is no just reason for delay." The Court will avail itself of this procedure because certain of

Plaintiff's claims have been stayed on agreement of the parties until such time as judgment has been issued on the claims decided in this opinion and all appeals have been exhausted. Further details are provided below.

under § 1581(a) would be manifestly inadequate because the company would likely cease to exist due to the financial effects of the Notice of Action before any § 1581(a) remedy could be obtained. *Id.* at 1322.

Having determined that jurisdiction under § 1581(i) was proper, this Court proceeded to grant a motion by ICP for judgment on the agency record, declaring that the Notice of Action was null and void because it was a "decision" that revoked the Ruling Letter without following the notice-and-comment requirements for revocation of ruling letters set forth in 19 U.S.C. § 1625(c). *Id.* at 1325–30. This Court found that Customs must reliquidate the Affected Entries consistent with the Ruling Letter, which this Court declared was still in force at the time the entries had been rate-advanced. *Id.* at 1333.

The Court of Appeals for the Federal Circuit ("CAFC") reversed this Court regarding jurisdiction, holding that "the remedy provided by subsection 1581(a) is not manifestly inadequate, and that therefore the Court of International Trade lacked jurisdiction under subsection 1581(i)(4)." *International Custom Products, Inc. v. United States,* 467 F.3d 1324, 1327 (Fed. Cir.2006) ("*ICP II*"). Due to the jurisdictional defect, the CAFC vacated this Court's decision regarding the merits of ICP's arguments and remanded the case for dismissal. *Id.* at 1328. Accordingly, this Court dismissed ICP's 2005 case. *International Custom Products, Inc. v. United States,* 31 CIT 266, 2007 WL 624052 (2007) (Judgment Order).

### 2. *The 2007 Case (the Current Case)*

In 2007, ICP timely filed this lawsuit, seeking, in essence, to raise the same challenges to the Notice of Action that were raised. in Court No. 05–00341, but on § 1581(a) jurisdictional grounds. A plaintiff must protest before Customs the duties imposed, have Customs deny that protest, then pay all imposed duties before bringing suit in the Court of International Trade ("CIT") under § 1581(a). Apparently because Plaintiff could not afford to pay the 2400% increase in duties on the scores of Affected Entries, Plaintiff protested and paid duties on a single entry, entry 180–0590029–7 ("the Entry"), upon which it bases this suit. The Entry was part of a group of 11 entries brought into the United States in 2005 after the Notice of Action was issued. Customs liquidated the Entry at the higher rate provided in the Notice of Action on June 29, 2007 and ICP protested the liquidation on July 26, 2007 with a request for expedited treatment. The protest was deemed denied. ICP paid the assessed duties by August 27, 2007 and filed this suit on August 28, 2007.

### 3. *The 2008 Cases*

Two other lawsuits filed by Plaintiff in 2008 are stayed pending the resolution of the current case. The first of these suits, assigned Court No. 08–00055, challenges as unlawful certain actions Customs took after importation of the Entry in the instant case. The precise content of that suit is immaterial here.[2] *See* Compl., Court No. 08–00055, ECF No. 4. The second 2008 suit, assigned Court No. 08–00189, also addresses events postdating the Customs actions challenged in the instant case and is immaterial here.[3] *See* Compl., Court No. 08–00189, ECF No. 2.

---

2. Court No. 08–00055 challenges Customs's formal revocation of the Ruling Letter pursuant to the notice-and-comment procedures of 19 U.S.C. § 1625(c), effective January 2,

2006. Those events postdate the events giving rise to the instant suit.

3. Court No. 08–00189 challenges on various grounds Customs's reclassification of 13 en-

The Court stayed all proceedings in Court No. 08–00055 and Court No. 08–00189 on October 29, 2008 and August 5, 2009, respectively.[4]

## B. Prior Proceedings in the Current Case

It will be useful to summarize here the prior opinions and proceedings of the Court with regard to the current case, leading up to the trial.

On November 30, 2007, the government responded to the complaint with a motion to dismiss for failure to state a claim upon which relief can be granted. *See* Motion to Dismiss, Court No. 07–00318, ECF No. 23. The Court granted the government's motion to dismiss as to two of ICP's claims.[5] *See International Custom Products, Inc. v. United States,* 32 CIT 302, 549 F.Supp.2d 1384 (2008) ("*ICP III* "). However, the Court denied the motion to dismiss as to three of ICP's claims: (a) Count I, alleging that the 2005 Notice of Action was unlawful because it revoked the binding Ruling Letter without going through the notice-and-comment revocation procedures required by 19 U.S.C. § 1625(c)(1), and applied that revocation retroactively; (b) Count II, making a similar allegation that Customs revoked a prior treatment of ICP's white sauce in violation of notice-and-comment requirements provided by 19 U.S.C. § 1625(c)(2); and (c) Count V, alleging that Customs violated ICP's constitutional due process rights when it revoked the Ruling Letter, depriving ICP of

a property interest in continued classification of its white sauce entries under the Ruling Letter absent notice and an opportunity to comment pursuant to 19 U.S.C. § 1625(c). *Id.* In the course of determining that Count I was not subject to dismissal for failure to state a claim upon which relief could be granted, the Court held that the Notice of Action was an "interpretive ruling or decision" within the meaning of 19 U.S.C. § 1625(c)(1) and "that, if the actions alleged of Customs are proven, Customs effectively revoked ICP's classification ruling by its conduct in connection with the white sauce importations." *ICP III,* 549 F.Supp.2d at 1393–94. After the Court issued its decision on the motion to dismiss, the government filed an answer to the complaint on April 14, 2008. Answer, Court No. 07–00318, ECF No. 44.

Plaintiff filed a motion for summary judgment on January 4, 2008 (Court No. 07–00318, ECF No. 27), and the government filed a cross-motion for summary judgment on September 26, 2008 (Court No. 07–00318, ECF No. 67). The Court denied those motions on January 29, 2009, finding that genuine issues of material fact precluded resolving the case without a trial. *International Custom Products, Inc. v. United States,* 33 CIT ——, 2009 WL 205860 (2009). In its opinion on the cross-motions for summary judgment, the Court specifically found that jurisdiction in the current case was properly based upon § 1581(a) and extended only to the Entry (entry 180–0590029–7), but not to any of the other 99 Affected Entries. *Id.* at *3.

---

tries of ICP's white sauce in 2007.

**4.** In Court No. 08–00055, the parties must file a joint scheduling order thirty days following entry of final judgment, and the conclusion of any appeals, in the current case. Order, Court No. 08–00055, ECF No. 12. Court No. 08–00189 is stayed until ten days after entry of a final judgment in the current case. Order, Court No. 08–00189, ECF No. 47.

**5.** The dismissed claims alleged that Customs impermissibly modified the Ruling Letter without a compelling reason, and that Customs's revocation of the Ruling Letter constituted rulemaking conducted without notice and comment in violation of section 553 of the Administrative Procedure Act, codified at 5 U.S.C. §§ 553 *et seq.*

The Court also identified in detail the issues of material fact preventing entry of summary judgment. First, the Court found that "there is a genuine issue of material fact as to whether the actual goods Plaintiff imported conform to the description of 'white sauce'" in the Ruling Letter. *Id.* at *5. At issue was whether the white sauce in the Entry contained xanthan gum or carboxymethylcellulose ("CMC") at all, and whether it contained milkfat (interchangeably referred to as "butterfat") in concentrations conforming to the Ruling Letter. *Id.* Second, the Court found that "[w]hether or not Plaintiff made entries of 'white sauce' that . . . can serve as 'prior treatment' for the purposes of 19 U.S.C. § 1625(c)(2), represents a genuine issue of material fact." *Id.* at *7. Third, the Court found that judgment could not be entered summarily on Plaintiff's Due Process claim because that claim relied on the alleged violation of 19 U.S.C. § 1625(c)(1) as to which the Court had already indicated genuine material issues of fact existed. *Id.* at *8. The government's cross-motion sought summary judgment on the basis that ICP had made a material misstatement or omission, by mischaracterizing the contents of white sauce and by failing to disclose known typical uses and designations of white sauce, when applying for the Ruling Letter. *Id.* The Court found that, although the government had presented "pertinent" evidence on these issues, that evidence was insufficient to determine the issue as a matter of law. *Id.*

## C. Bifurcation of the Current Case

On August 4, 2010, the parties jointly moved to bifurcate trial of Plaintiff's remaining claims in the current case into two phases, with Plaintiff's 19 U.S.C. § 1625(c)(1) claim and due process claim to be tried first and Plaintiff's 19 U.S.C. § 1625(c)(2) claim to be reserved and stayed for possible later trial, pending the outcome of the first phase. (Joint Motion to Sever (Bifurcate Trial), Court No. 07–00318, ECF No. 157.) The Court granted this motion. (Order of August 13, 2010, Court No. 07–00318, ECF No. 158.) For this reason, no evidence concerning Plaintiff's 19 U.S.C. § 1625(c)(2) claim was taken during the present trial; that portion of Plaintiff's complaint remains stayed at this time.

## II. Pretrial

After some additional motion practice, and a limited extension of discovery, the parties submitted proposals for a pretrial order to govern trial of this case. In doing so, differences between the parties as to the admissibility of certain evidence arose.

## A. Evidentiary Issues

Two evidentiary issues raised by the parties in the pretrial stage remain pending before the Court. First, Plaintiff sought an adverse inference that certain samples of white sauce, destroyed while in the government's possession, contained ingredients that conformed to the description of white sauce set forth in Plaintiff's ruling request. (Pl.'s Mot. in Limine, Court No. 07–00318, ECF No. 172.) The Court denied this motion, but permitted Plaintiff to present evidence relevant to spoliation at trial and renew the motion at the close of trial if Plaintiff wished to do so. (Order of May 26, 2011, Court No. 07–00318, ECF No. 190.) Second, the Court deferred ruling on a motion by Defendant (Def.'s Second Mot. in Limine and for Disqual., Court No. 07–00318, ECF No. 163) to exclude Plaintiff's counsel, Mr. Teufel, until such time as Plaintiff might actually seek, at trial, to introduce testimony from Mr. Teufel. (Slip Op. 11–60, May 26, 2011, Court No. 07–00318, ECF No. 189.)

As for exhibits, those issues were resolved prior to trial, with the exception of Plaintiff's Ex. 18. After motion practice and discussions between the parties and the Court as to the admissibility of paper exhibits and deposition transcripts, the parties each moved in colloquy immediately prior to the beginning of trial to admit a particular set of exhibits to which the other party did not object. Upon consideration of the consent of the parties and upon the Court's own consideration of the admissibility of the exhibits, the Court admitted into evidence Plaintiff's Exhibits 1–7, 9, 12–13, 15–16, 19, 21, 23, 25–27, 30–34, 44, 50a–50ppppp, 51–59, 62–64, 66, 68–74, 77–78, 80–81, 85, 88–89, 93–94, 96, 98, 100, 105–107, 237, 242–243, 253, 255–258, 277, and 281–282; and Defendant's Exhibits A–HH, KK–OO, and RR–DDD. (Tr. 6–15; Pretrial Order, Court No. 07–00318, ECF No. 235, Attachs. 1–5.)[6] The Court took testimony regarding Plaintiff's Ex. 18 (production "make sheets" from the files of the New Zealand-based manufacturer of white sauce) and admitted that exhibit over Defendant's hearsay objection. (Tr. 195–197.)

## B. Pretrial Order

A pretrial order in this case was entered on January 25, 2012. (Pretrial Order, Court No. 07–00318, ECF No. 235.) Plaintiff and Defendant outlined the issues for trial in their respective Pretrial Order Schedules. (Pretrial Order, Court No. 07–00318, ECF No. 235, Scheds. F1 and F2.) To ensure that the relevant legal and factual issues were properly framed prior to

trial, the Court distributed an outline of relevant issues to the parties at a pretrial conference on November 17, 2011, and the parties confirmed their agreement.

### 1. *Issues for Trial*

The principal issues to be decided are (1) whether the white sauce in the Entry conformed with the Ruling Letter and (2) whether the Ruling Letter was invalid due to material false statements or omissions made by ICP in seeking it. (*Id.*)

As to whether the white sauce in the Entry conformed with the Ruling Letter, there are two relevant questions: (a) did the white sauce in the Entry contain CMC and xanthan gum, and (b) did the white sauce in the Entry contain between 72% and 77% milkfat. A subsidiary question is whether the Entry failed to materially conform to the Ruling Letter if its milkfat content was above 77%.

As to whether the Ruling Letter is invalid due to material false statements or omissions made by ICP, three questions are relevant: (a) did ICP fail to disclose its knowledge as to the typical use of white sauce; (b) did ICP fail to disclose all the commercial, common, and technical designations for white sauce; and (c) did ICP mislead Customs as to the purpose of the ingredients in white sauce. (Pretrial Order, Court No. 07–00318, ECF No. 235, Sched. D2 at ¶ 2.)

### 2. *Uncontested Facts*

Certain basic facts regarding this case were agreed upon between the parties in

---

**6.** A color-coded chart of all proposed exhibits was incorporated into the Pretrial Order in lieu of Pretrial Order Scheds. H–1 and H–2. (Court No. 07–00318, ECF No. 235, Attachs. 1–5.) This chart marked each exhibit in either light or dark green (stipulated to by the parties), yellow (status to be determined at the opening of trial), or red (withdrawn by the parties). The Court had indicated to the parties on the chart the manner in which it intended to rule should a decision be required on the dark green or red entries, but the necessity for the Court to issue those rulings was avoided by the stipulations and withdrawals of the parties.

the pretrial order. (Pretrial Order, Court No. 07–00318, ECF No. 235, Sched. C.) Those facts are as follows. Dennis Raybuck is the President and founder of ICP, an importer and distributor of dairy products, including white sauce, to manufacturers of food products. (*Id.* at ¶¶ 1–3.) White sauce is a milkfat-based product that serves as the base and can be an ingredient for products including, but not limited to, gourmet sauces, salad dressings, processed cheeses, club cheese preparations, other sauces, and baked goods. (*Id.* at ¶¶ 4–5.)

In 1998, ICP sought a binding tariff classification ruling from Customs, stating in its request that white sauce "may be used as the base for a gourmet sauce or salad dressing" and "is the commercially recognized formulated sauce preparation which serves as the base for production of gourmet sauces and dressings." (*Id.* at ¶¶ 6–8.) A specification sheet for white sauce, attached to ICP's ruling request, stated that white sauce "has been properly acidified and contains all of the necessary thickeners and emulsifiers needed for the further production of gourmet sauces and dressings," which was given as white sauce's "[t]ypical usage." (*Id.* at ¶¶ 9–10.) According to the specification sheet, the "producer of gourmet sauces and dressings need only add the proper flavoring compounds necessary for the production of their specific sauce or dressing." (*Id.* at ¶ 11.) The specification sheet also listed, under the heading "TYPICAL ANALYSIS," milkfat content of 72%–77% and ingredients as "Milkfat, Water, Vinegar (and/or lactic acid and/or citric acid), Zanthum [sic] gum, Carboxymethelcellulose [sic], Sodium Phosphate and/or Sodium Ci-

trate." [7] (*Id.* at ¶¶ 12–13.) ICP also submitted a sample of white sauce with the ruling request. (*Id.* at ¶ 15.) Customs issued the Ruling Letter on January 20, 1999, classifying the product described in the ruling request in HTSUS 2103.90.90, providing for "[s]auces and preparations therefor; . . .: [o]ther: [o]ther: [o]ther: [o]ther," with a duty rate of 6.6% *ad valorem.* (*Id.* at ¶ 16–17.) [8]

Beginning in early 2000, ICP purchased property to build a manufacturing facility, but production did not begin until the first quarter of 2005 due to a lawsuit and sewer and zoning problems. (*Id.* at ¶¶ 26–32.)

Customs tested three samples of ICP's imported white sauce between 2000 and 2007. (*Id.* ¶ 34.) In 2001, Customs requested the breakdown of a sample, asking "DOES IT CONTAIN MILK OR CHEESE?" (*Id.* at ¶ 36.) The lab reported that the 2001 white sauce sample contained 72.97% milkfat and concluded that "Fat and Moisture analyses indicates [sic] that the sample contains 73% fat and 23% moisture which is consistent with the information provided by the importer. Information from the importer indicates the sample contains 77% [milk]fat, 21% moisture, and 2% (Lactic acid, zanthum [sic] gum, carboxymethelcellulose [sic], sodium phosphate and sodium citrate)." (*Id.* ¶ 37–38.)

A second white sauce sample was tested to verify the ingredient breakdown in late 2004; two reports concluded that the milkfat content of this sample was approximately 78%. (*Id.* ¶¶ 39–41.) Certificates of analysis for the entry from which the 2004 sample was taken indicate milkfat content of 77.3% and 78.1%, calculated using a technique called the "by difference" meth-

---

7. "Zanthum gum" is an incorrect spelling of xanthan gum and "Carboxymethelcellulose" is an incorrect spelling of carboxymethylcellulose, *i.e.*, CMC. *Id.* at ¶ 14.

8. That tariff rate was reduced to 6.4% *ad valorem* in the 2005 HTSUS. (*Id.* at ¶ 18.)

od. (*Id.* at ¶ 48.) The data attached to the 2004 and 2005 reports on the 2004 sample list slightly varying percentages of both milkfat and butyric acid (a measurement that allows for conversion of tested crude fat levels into milkfat levels). (*Id.* ¶¶ 42–47.) The butyric acid levels given with the lab reports lead to a calculation that more than 100% of the sample's crude fat consists of milkfat. (*Id.* at ¶¶ 45–47.)

Customs sent a final white sauce sample for testing in 2007 in order to verify its ingredient breakdown, specifically requesting that the ingredients on the specification sheet be verified and that the lab determine whether the white sauce was an emulsion (and if so, of what type). (*Id.* at ¶¶ 51–52.) For the 2007 sample, the lab determined a milkfat content of approximately 76.58%, rounded up to 77% in the lab report, which was 1.52% less than the milkfat percentage stated in the certificate of analysis accompanying the entry. (*Id.* at ¶¶ 53–56.) The average lab findings of milkfat content in the 2001, 2004, and 2007 samples was 75.84%. (*Id.* at ¶ 58.)

On an unspecified date, ICP created for its main customer, Schreiber Foods ("Schreiber") (the company that purchased the Entry) a white sauce specification sheet which did not list xanthan gum or CMC as ingredients. (*Id.* ¶ 21–22.)

Customs liquidated the Entry under HTSUS 0405.20.30 on June 29, 2007; ICP timely protested liquidation, the protest was deemed denied, and ICP paid the assessed duties of $66,602.32 by August 27, 2007. (*Id.* at ¶¶ 23–25.)

### III. TRIAL

The trial of this matter was held before the undersigned at the Court of International Trade on February 6–10, 2012.

#### A. Trial Exhibits

As mentioned above, in colloquy at the commencement of the trial the Court granted Plaintiff's unopposed motion to enter into evidence Plaintiff's Exhibits 1–7, 9, 12–13, 15–16, 19, 21, 23, 25–27, 30–34, 44, 50a–50ppppp, 51–59, 62–64, 66, 68–74, 77–78, 80–81, 85, 88–89, 93–94, 96, 98, 100, 105–107, 237, 242–243, 253, 255–258, 277, and 281–282; and Defendant's Exhibits A–HH, KK–OO, and RR–DDD. (Tr. 6–15; Pretrial Order, Court No. 07–00318, ECF No. 235.) The Court heard testimony from Dennis Raybuck, the CEO of ICP, that Plaintiff's Exhibit 18 contained production control sheets, also called make sheets, from a plant run by ICP's New Zealand based white sauce supplier. (Tr. 103.) Mr. Raybuck testified that he visited the plant at least once a year and looked at make sheets during his visits. (Tr. 105.) Mr. Raybuck stated that shift supervisors in charge of running the plant prepared the make sheets contemporaneously with production, recording information within their direct knowledge, and that the make sheets were kept in the regular course of business. (Tr. 104–05.) On voir dire, Mr. Raybuck stated that he examined the make sheets in batches for approximately one hour during his visits to ICP's supplier's plants, did not personally fill out the make sheets, never worked for or held an ownership interest in the supplier company, and did not know what rules the supplier had regarding how the make sheets were to be filled out. (Tr. 105–09.) The government moved to exclude Plaintiff's Exhibit 18 on hearsay grounds, arguing that the make sheets were unreliably filled-out and that Mr. Raybuck could not establish a business records exception because he did not work for the white sauce supplier company. (Tr. 109.) The Court admitted Plaintiff's Exhibit 18 into evidence under Federal Rule of Evidence 803(6), the business record exception to the hearsay rule. (Tr. 195–96.) The Court found that Mr. Raybuck was a quali-

fied witness as to the regularity of the records, and his testimony established that the make sheets were made at or near the time, by (or from information transmitted by) someone with white sauce production knowledge and were kept in the ordinary course of business as a regular practice. (Tr. 196–97.) The Court found that the government's objection that the records were not filled out in a reliable manner went to weight, not admissibility. (Tr. 197.)

## B. Trial Testimony

Because the parties included many of the same witnesses on their witness sheets, the Court allowed the witnesses to be called only a single time and gave the parties latitude in their questioning.

Plaintiff called Dennis Raybuck, the president and CEO of ICP, as both a fact witness and an expert witness (Tr. 92–463, 597–709, 817–23, and 1088–1117); Donald B. Learmonth, an executive with Fonterra and associated companies that supplied ICP's white sauce, as a fact witness (Tr. 465–502); Stanley Hopard, a former Customs National Import Specialist who authored the Ruling Letter, as a fact witness (Tr. 503–75); Leslie Aita, a Customs Import Specialist involved in the investigation that led up to Customs issuing the Notice of Action, as a fact witness (Tr. 576–96); Alexander J. Costigan, former owner of Level Valley Creamery, as a fact witness (Tr. 710–30); and Gerd Stern, the former owner of companies that were early suppliers of ICP's white sauce, as a fact witness (Tr. 730–64).

Defendant called Diane Kutskel, Mr. Raybuck's former assistant at ICP, as a fact witness (Tr. 766–815); John G. McManus, director of purchasing for Schreiber Foods from 1998–2004, as a fact witness (Tr. 832–69); Julian B. Heron, an attorney who represented ICP in the past and who prepared the Ruling Request, as a fact witness (Tr. 870–85); Cheryl Glenzer, a former senior ingredients purchaser for Schreiber Foods from 1989–2006, as a fact witness (Tr. 886–903); and Dr. Robert L. Bradley, Jr., a dairy professor at the University of Wisconsin, as an expert witness (Tr. 904–1080).

## IV. FINDINGS OF FACT

Upon the trial record, the Court's consideration of the testimony taken, the Proposed Findings of Fact submitted by the parties, and all other papers and proceedings had in this matter, the Court hereby makes the following findings of fact.

## A. Ingredients in the Entry

The Court finds that the white sauce in the Entry contained CMC and xanthan gum in functional amounts, and an actual milkfat content under 77%.

### 1. CMC and Xanthan Gum

CMC and xanthan gum serve to thicken liquids. (Tr. 163.) Mr. Learmonth and Mr. MacBeth, employees of ICP's supplier, credibly confirmed that the supplier always added CMC and xanthan gum to the white sauce it manufactured for ICP. (Tr. 479; Pl.Ex. 9 at 50–1.) Mr. Raybuck provided ICP's supplier with the same specification sheet for white sauce that was supplied to Customs with the Ruling Request (Tr. 225–26; Pl.Ex. 2 at 3), and ICP instructed the supplier to include .2% CMC and .25% xanthan gum so that the white sauce would contain thickeners in the middle of the functional range (Tr. 203). When Mr. Raybuck used the white sauce in his test kitchen, it always thickened upon heating and otherwise acted in a manner consistent with containing CMC and xanthan gum in effective quantities. (Tr. 164–65.) Numerous certificates of analysis ("COAs"), make sheets, and other documents recording the regular proce-

dures of ICP's white sauce supplier regarding batches of white sauce produced in the period leading up to manufacture of the Entry, as well as of the Entry itself, confirm the presence of CMC and xanthan gum in the white sauce generally and in the Entry specifically. (Pl.Exs. 18, 31.) The Court finds that Plaintiff established with this evidence that the Entry contained CMC and xanthan gum in functional quantities.

The Court also finds that ICP created a business, Giuseppe's Finer Foods, to create a line of gourmet sauces from white sauce, and credits Mr. Raybuck's testimony that ICP would have made three to four times as much money at this business than it made selling white sauce to Schreiber. (Tr. 285–86.) The record shows that ICP built a facility for the manufacture of these sauces. (Tr. 285–86, 298–307; Pl.Ex. 258.) The Court finds ICP's actions consistent with a genuine intent to use white sauce in the manner described in the Ruling Request, and further finds that removing CMC and xanthan gum from white sauce would have prevented this use. This provides a further basis for the Court to credit Mr. Raybuck's testimony that CMC and xanthan gum were always in the white sauce.

Although CMC and xanthan gum were removed from certain specification sheets for ICP's white sauce (Pl.Ex. 21), Plaintiff established to the Court's satisfaction that this change in documentation was merely an accommodation made to a customer, and was not accompanied by a change in the actual ingredients of white sauce (Tr. 94–100; Tr. 479; Pl.Ex. 9 at 50–1). The Court also credits Mr. Raybuck's testimony that CMC and xanthan gum were removed from the Schreiber specification sheets after ICP's then-attorney, Mr. Heron, told ICP that changing the specification was permissible. (Tr. 95, 100–01.)

Although the government called Mr. Heron and he was unable to recall the consultation, the government never established that the consultation did not occur. (Tr. 876–84.) But regardless of the question of whether ICP made the specification sheet change upon legal consultation, the Court finds that the stripping of CMC and xanthan gum from the specification sheets was done at the request of ICP's principal customer, Schreiber, for sales purposes, and was not accompanied by a corresponding stripping of those ingredients from the white sauce in the Entry.

Dr. Bradley testified that CMC and xanthan gum were not present in effective concentrations in the Entry. (Tr. 944–45, 950–55.) The Court finds that testimony to be unreliable and unconvincing.

It is worth examining at this point the reasons that the Court finds Dr. Bradley to have been an unreliable witness. First, Dr. Bradley had financial motives to support the government's position, as a long-term and frequent expert witness for the government. (Tr. 963–69.) The mere fact that hired experts ordinarily have financial interest in providing useful testimony to their clients does not typically lead the Court to question the usefulness of an expert's conclusions. Dr. Bradley, however, attempted to downplay the financial significance of his service as a government expert and the extent of his ongoing involvement in such work. (*Id.* (testimony of Mr. Bradley, in which he stated that he only worked as an expert for the government "[t]hree or four days a year, maybe, at the most," later admitted that he was also paid to act as a consulting expert in many other cases, yet answered "[n]one" to the number of cases in which he had served as a consultant but not testified).) In addition, the Court finds that Dr. Bradley had a partisan sympathy to the government's case that undercut the reliability of

his expert testimony. (*See generally* Tr. 1031–35.) Dr. Bradley declared, "I always maintain an objective attitude." (Tr. 969.) That declaration was belied by Dr. Bradley's later testimony to the Court that "... [w]hen [ICP] went to get the ruling, they only had gourmet sauces and dressings on the recommended uses.... And then subsequently, after talking with Schreiber, [ICP] amended that and added more uses .... if they had gone for a ruling with all of those uses on, we might not be here today." (Tr. 1035.) Dr. Bradley articulated a legal argument as to the inappropriateness of ICP's Ruling Request during his testimony and, in doing so, a personal commitment to the government's victory in this case. Dr. Bradley's advocacy was highlighted by the urgent manner in which he spoke from the witness stand. Dr. Bradley was offered by the government, and accepted by the Court, as an expert on "dairy processing, dairy products, dairy testing" and "the use of pricing of butter and the pricing of white sauce." (Tr. 940–41.) Yet he exceeded the accepted scope of expertise to lecture the Court with his legal opinion as mentioned above. (Tr. 1035.) Dr. Bradley's expertise also did not include sauces or dressings, or the use or detection of CMC and xanthan gum in such products, yet he provided testimony about those questions despite admitting that he had no expertise in commercial sauce or dressing production. (Tr. 929–31, 933–34, 940–41, 950–55, 974, 979–81, 1041–55, 1077–79.) That testimony was not only unhelpful, but also baseless. Dr. Bradley had neither a basis as an expert for opinions on such issues nor any factual basis for the opinions he expressed in those portions of his testimony. As a result, the Court finds Dr. Bradley's testimony about the amount and function of CMC and xanthan gum in ICP's white sauce to be unpersuasive.

## 2. *Milkfat Content*

The Court finds that the Entry contained milkfat in a concentration between 76% and 77%. Direct evidence on the milkfat content of the Entry exists in the COAs made at the time the Entry was manufactured and shipped from the supplier. (Pl.Ex. 27 at ICP001393–94.) The Entry consisted of 1120 cartons of white sauce, each weighing 25 kilograms. (*Id.*) The Entry contained 1099 cartons from a batch of white sauce with a COA showing a milkfat content of 77.3%, and 21 cartons from a batch of white sauce with a COA showing a milkfat content of 77.4%. (*Id.* at ICP001390.) This milkfat percentage was calculated using the "by difference" method, which estimates milkfat concentration by removing moisture from the sample and assuming that the remainder is comprised solely of milkfat. (Tr. 165–66 (Mr. Raybuck); Tr. 480–81 (Mr. Learmonth).) "By difference" calculations overstate the actual milkfat content slightly, because it lumps contents such as CMC, xanthan gum, and other additives in white sauce into the milkfat percentage. (*Id.*) This is shown by Customs's own laboratory tests of ICP's white sauce during the course of importation. For example, the COA for one of ICP's importations of white sauce showed a milkfat concentration, calculated "by difference," of 78.1% (Pl.Ex. 58), but testing by a Customs laboratory of a sample from that shipment of white sauce showed an actual milkfat concentration of 76.6%, rounded up for purposes of the lab report to 77% (Pl.Ex. 7). A 2001 laboratory test by Customs had similar results, determining actual milkfat concentrations of an ICP white sauce sample to be more than 4% lower than the percentage "by difference" stated on the COA. (Pl.Ex. 4.) In sum, the Court credits the exhibits and testimony that the "by difference" method overstated milkfat concentrations in ICP's

white sauce imports by at least .75%. Consequently, the Court finds that the actual milkfat concentration of the white sauce in the Entry was approximately 76.65%, and therefor fell within the range of "typical" milkfat concentration for white sauce provided in the Ruling Letter.

The Court also finds that, even if the Entry contained a milkfat concentration slightly above 77%, as claimed by the government, the overage would be immaterial. Evidence supporting this finding of fact is contained in the Customs laboratory reports at Plaintiff's Exhibits 5–6. These reports were issued in response to a request that the laboratory test a sample of ICP's white sauce for classification and conformance with the Ruling Letter. (*Id.*) While the Court agrees with Plaintiff that the test results contain internal inconsistencies that make the conclusion as to actual milkfat content unreliable, the reports nonetheless determined that white sauce samples containing 78% milkfat conformed to the Ruling Letter. (*Id.*) Additionally, Mr. Hopard, who drafted the Ruling Letter, testified that no specific milkfat concentration or range of concentration was necessary for conformance with the Ruling Letter. (Tr. 506–07.) Mr. Hopard also testified that, when the Customs laboratory determined that samples of ICP's white sauce contained between 77% and 78% milkfat, Customs believed that "[i]t was consistent" with the ingredients of white sauce as stated by ICP. (Tr. 525.) Thus the Court finds that Customs believed that the Ruling Letter properly applied to ICP white sauce even when that white sauce contained a milkfat concentration of 78%.

In sum, the Court concludes that the Entry physically conformed to the Ruling Letter because it contained CMC and xanthan gum in functional quantities and contained milkfat in an amount consistent with the typical range.

**B. How the Ruling Letter Was Obtained**

As an affirmative defense, the government claimed that the Ruling Letter was void *ab initio* because ICP made material misrepresentations and omissions when it applied for the Ruling Letter. Examining the record, the Court finds that ICP adequately informed Customs of the typical uses of white sauce; the common, commercial, and technical designations for white sauce; and the purpose of the ingredients in white sauce when it applied for the Ruling Letter. Therefore, the Ruling Letter was valid at the time of the Entry and was not void *ab initio*, as claimed by the government.

*1. Contents of the Ruling Request*

As an initial matter, it is important to describe exactly what the Ruling Request contained.

First, the packet contained a letter to Customs dated December 21, 1998, stating that ICP's white sauce "may be used as the base for a gourmet sauce or salad dressing" and "is the commercially recognized formulated sauce preparation which serves as the base for production of gourmet sauces and dressings." (Pl.Ex. 2 at ICP000001.)

Second, a specification sheet described white sauce by stating that it "has been properly acidified and contains all of the necessary thickeners and emulsifiers needed for the further production of gourmet sauces and dressings," which was given as white sauce's "[t]ypical usage." (*Id.* at ICP000003.) Under the heading "TYPICAL ANALYSIS," the specification sheet gave milkfat content of 72%–77% and ingredients of "Milkfat, Water, Vinegar (and/or lactic acid and/or citric acid), Zant-

hum [sic] gum, Carboxymethelcellulose [sic], Sodium Phosphate and/or Sodium Citrate." (*Id.*)

Next, two recipes incorporating white sauce were provided, one for "Gourmet Hollandaise Sauce" and one for "Gourmet Salad Dressing."

Then, an October 1998 article in a food industry magazine entitled "Secrets to Sauce Success" was included. The article "Secrets to Sauce Success" quotes a Kraft Food Ingredients employee, who describes the beginning stage of making a sauce this way:

> [Y]ou're going to make a white sauce, and the white sauce is just a thickening system. [ . . . ] And you're going to build into that thickening system any special functionality you need, including flavor. But if you're building a decent white sauce, it's going to have just about all the functionality you need.

(*Id.* at ICP000006.) The article goes on to describe the use of stabilizers, such as xanthan gum and CMC. (*Id.* at ICP000006–10.) Regarding the final stage, flavoring the sauce, the article discusses the growing popularity of cheese-flavored and cheese sauces, and mentions that "sauces can run the gamut from high-fat cheese-based and cream-based sauces to nonfat gravies." (*Id.* at ICP000011.)

The final two items in the Ruling Request were a physical sample of white sauce and a price quote for white sauce from an Israeli supplier. (Pl.Ex. 2 D, E.)

### 2. *Known Typical Uses of White Sauce*

The Court finds that ICP provided adequate information regarding the principal use of white sauce in the Ruling Request.

In its Ruling Request, ICP informed Customs in numerous ways that white sauce was "the commercially recognized formulated sauce preparation *which serves* as the base for production of gourmet sauces and dressings*"* and that it "may be used as the base for gourmet sauce or salad dressing." (*Id.* at ICP000001) (emphasis added). The included specification sheet added the information that white sauce "has been properly acidified and contains all of the necessary thickeners and emulsifiers needed for the further production of gourmet sauces and dressings." (*Id.* at ICP000003.) Usage as a "base sauce preparation for gourmet sauces and dressings" is described as typical. (*Id.*) The attached recipes gave specific examples of these typical uses, and the article made clear that professionals in the sauce industry saw a "decent white sauce" as the basis upon which any of a variety of different sauces could be made. (Pl.Ex. 2 C.) Mr. Raybuck, who was qualified as an expert on sauce making, testified that manufacturers of sauces and dressings had been creating an industrial version of white sauce since the early 20th century and that he had seen this white sauce used in making hollandaise sauce and vodka sauce. (*See, e.g.,* Tr. 156–60.) The Court credits this testimony and the submissions in the Ruling Request, especially as the trade magazine article provides strong independent corroboration for Mr. Raybuck's statements. The Court therefore finds that ICP accurately described the use of white sauce when it submitted the Ruling Request to Customs.

The government pointed, however, to several ICP-produced specification sheets for white sauce listing possible uses different from the principal use as a base for sauces and dressings described in the Ruling Request. The stand-out among these is an early white sauce specification sheet ICP gave to Kraft Foods during business negotiations shortly before ICP submitted its Ruling Request—negotiations that were never consummated. (Def.Ex. S.)

This specification sheet bears the date August 1, 1998 and a fax header showing it was faxed to Kraft on October 7, 1998, about two and a half months before ICP submitted its Ruling Request to Customs. (*See id.*, Pl.Ex. 2.) It describes white sauce as "the food product made from fresh cream and other high quality ingredinets [sic] via a proprietary process ... [and] used as a base sauce preparation for any sauce or dressing that is in need of this particular taste profile." (Def.Ex. S.) Recommended usage is given as "an ingredient in baked goods and butter based sauces." (*Id.*) This specification sheet, unlike all others in the record, contains a disclaimer that reads, "[t]his information is presented for consideration in the belief that it is accurate and reliable" but stating that "no warranty, either express or implied is made...." (*Id.*) Within days before ICP faxed Kraft this specification sheet, the two companies entered into a "Confidential Disclosure Agreement" to share information regarding a process ICP had developed to import a product and convert it into anhydrous milkfat (AMF), and which Kraft wished to evaluate. (Def.Ex. RR.)

Plaintiff submitted a collection of eleven specification sheets into the record, each describing white sauce as "the commercially recognized formulated sauce preparation which serves as the base for the production of gourmet sauces and dressings" and indicating that "[t]ypical usage is as a base sauce preparation for gourmet sauces and dressings." (Pl.Ex. 21.) These specification sheets are, in these regards, identical to the specification sheet submitted by ICP with its Ruling Request. (*Compare* Pl.Ex. 2 (Ruling Request) *with* Pl.Ex.

21.) However, five of the specifications sheets in Pl.Ex. 21 include an additional sentence in the recommended usage section: "Other uses include processed cheese sauces, processed cheese and club cheese preparations." (Pl.Ex. 21, pages marked in lower right corner "LV1143," "080," "085," "275," and "0850.") The Court finds that the specification sheets with the "processed cheese" language were provided to customers on or after September 7, 1999.[9] (*Id.*) As such, these specifications sheets were employed after the Ruling Letter had already been issued.

Mr. Hopard credibly testified that, in issuing the Ruling Letter, he relied on the accuracy of ICP's representations in the Ruling Request as to the principal use of white sauce, as required by regulation. (Tr. 549–50.) Mr. Hopard examined the various specification sheets for white sauce and testified that his decision would have taken into consideration the alternative uses of white sauce given there, had those alternative uses been disclosed. (Tr. 555–65.) During the government's examination of Mr. Hopard, he was presented with a hypothetical question as to whether he would have classified white sauce differently if he had seen all of the various uses referred to in the specification sheets postdating the ruling letter, and he answered that he would have. (Tr. 565.) However, Mr. Hopard later clarified that "if the greatest use in the United States of this so-called white sauce was to make sauce preparations, then that would be a factor in calling that the principal use" despite the other potential uses. (Tr. 571.)

The "principal use" question was a central topic of Mr. Hopard's testimony, since, as he repeatedly emphasized, the principal

---

**9.** Although many of the specification sheets are marked, incorrectly, with dates in 1998, those sheets contain fax headers showing when they were provided to Schreiber. None of the fax headers predates September 7, 1999. The only specification sheet without a fax header bears a date from 2003.

use of the class or kind of goods to which a product belongs is "very critical" when classifying that product. (*See, e.g.,* Tr. 553.) But the Court will perhaps be forgiven this observation: deciding the critical question of the classification of a good in a principal use provision of the tariff appears to be an almost ineffable experience on a par with describing the sound of one hand clapping.[10] Mr. Hopard confirmed that the process contains two steps: first, to identify the class or kind of good to which the product in question belongs; and second, to determine what the principal use of that class or kind of goods is. (Tr. 519–20.)

Mr. Hopard struggled, however, to articulate how the first step would be conducted. For example, he stated, "Well, class or kind is broad in scope ... [and] includes products that are ... not necessarily identical, but have similar characteristics." (Tr. 515–16.) As to defining this in a particular case, "there are no definite steps," but it is a "question of the type of product presented to you" and how it "relates to others you have seen" or "other types of products you have done research on and so forth." (Tr. 516.) Class or kind is "broader and not just the product in front of you," which takes some burden off the importer to be responsible for the actual use of a particular importation. (Tr. 541.)

Furthermore, Mr. Hopard was unaware of the government ever having done any class or kind determination with regard to white sauce. (Tr. 516–17.) To his knowledge, no inquiries to any other sauce makers were made to determine whether or not white sauce was of the class or kind of

goods used in the preparation of sauces. (Tr. 521.) In the absence of other evidence of a class or kind investigation, the Court finds that the government never determined what class or kind of good white sauce belonged to.

As for the second step of a principal use determination, identifying the principal use of the class or kind of good to which a product has been determined to belong, principal use is "defined in the tariff" as "a use of a product that exceeds all other uses ... in the United States of the class or kind of good" to which the product in question belongs. (Tr. 515.)

Mr. Hopard described implementing that process in a manner that leads the Court to find that it was more a matter of intuition that rigorous analysis. For example, Mr. Hopard stated that "[y]ou decide it based upon the identity of the product, how it's going to be used, where similar products have been used in industry and such. *That's kind of how you get the feel of that.*" (Tr. 559) (emphasis added). It is "a decision I make based upon the facts presented to me and my knowledge of other types of products that fall into that general category of good." (Tr. 559–60.) It is "based upon what other independent research and knowledge you gain being on the job, you discover certain similarities in types of products." (Tr. 564.) Mr. Hopard also testified that, contrary to an actual use tariff provision, a primary use provision gives an importer more leeway because the actual use of a particular entry is not determinative. (*See* Tr. 541.)

After carefully considering all of the testimony from Mr. Hopard, the former offi-

---

**10.** This should not be taken as an indication that Mr. Hopard was not a credible witness. Overall, the Court found Mr. Hopard to be informative and helpful, with a refreshing dedication to providing honest testimony evidenced in the way he fully engaged the questions put to him and provided clear answers without shying away from nuance during examination by the attorneys for both parties.

cial who was responsible for conducting the analysis of principal use and drafting the Ruling Letter, the Court finds that Defendant has failed to show that the Ruling Letter was obtained by false information or material omissions from ICP regarding the principal use of the class or kind of goods to which white sauce belongs.

### 3. Common, Commercial, and Technical Designations for White Sauce

The Court finds that ICP provided Customs with adequate information about the common, commercial, and technical designations for white sauce at the time at which ICP applied for its ruling letter. This has already been shown by the evidence establishing that white sauce is used by manufacturers as a base for the creation of sauces and dressings as described in, for example, the article included with the Ruling Request.

Defendant's challenges on this issue point out that ICP failed to tell Customs in the Ruling Request about alternative names used by other companies to refer to ICP's white sauce. Plaintiff does not contest that Schreiber referred to ICP's white sauce by a Schreiber-chosen designation "CMF–403," incorporating the acronym for concentrated milkfat. (Tr. 622–23 (Mr. Raybuck).) However, the Court finds no evidence in the record that ICP provided paperwork to Schreiber using the CMF designation for white sauce earlier than 2003 and therefore could not have informed Customs about that designation in the 1998 Ruling Request. (Pl.Ex. 2; Def. Ex. EE.) The Court also finds that ICP did not control the terminology employed by Schreiber, but merely complied with its customer's request to use a preferred designation on paperwork when the two companies did business. (Tr. 622–23.) It is also important to note that the name of a

product in a ruling request is "really not very important" and "is not something that has great weight" in determining classification, according to Mr. Hopard. (Tr. 551–52.) Therefore, the Court finds that ICP did not omit material information from the Ruling Request by failing to tell Customs about other names used for white sauce.

### 4. Purpose of the Ingredients in White Sauce

The government contends that ICP designed white sauce as a vehicle to sneak large amounts of milkfat into the U.S. without paying the properly-applicable duties or falling under the applicable quotas, and never intended to manufacture it into sauces or dressings. (Def.'s Post Trial Findings of Fact and Conclusions of Law at 19, Court No. 07–00318, ECF No. 251.) The government's theory is that ICP therefor tried to maximize the milkfat content of white sauce and minimize the other ingredients.

Contrary to the government's contentions, the Court finds that ICP genuinely intended to use its imports of white sauce as a base for the manufacture of gourmet sauces and dressings. This is established by credible evidence on the record that ICP created a subsidiary, Giuseppe's Finer Foods, intended to produce gourmet sauces and dressings from white sauce. (Tr. 132–35, 286.) ICP also struggled through logistical difficulties to build, at great expense, a large production facility at which it intended to produce gourmet sauces and dressings (Tr. 286, 298–307, Pl.Ex. 258). ICP formulated an Awesome Aussie Grilling Sauce and an Awesome Aussie Seafood Sauce, and had discussions with both Outback Steakhouse and Red Lobster restaurants about supplying those products. (Tr. 285–86.) Mr. Raybuck testified that, "had we been able to accomplish

that ... we would have made about three or four times on [white sauce] than what we were doing just selling it to someone else. So that was always our interest in doing that." (Tr. 286.) The Court credits Mr. Raybuck's testimony, and finds that ICP genuinely intended to use its white sauce in the manner described in the Ruling Request and allowed by the Ruling Letter.

Testimony from Diane Kutskel, who was subpoenaed and testified involuntarily, implied otherwise. (Tr. 765–815.) Ms. Kutskel was Mr. Raybuck's only employee at ICP for the first few years after its inception; she started as secretary and eventually handled many varied administrative responsibilities. (Tr. 768–69.) According to Ms. Kutskel, Mr. Raybuck "told me, because it always had to be kept very secretive, but he basically told me that [white sauce] was just another way to bring in butter." (Tr. 775.) She also claimed that Mr. Raybuck told her that ICP's $65 million production plant was built as a cover for continuing to import white sauce. (Tr. 798–99.)

Two reasons that the Court does not credit Ms. Kutskel's testimony bear discussing. Firstly, Ms. Kutskel is an unreliable witness given that she and Mr. Raybuck appear to have had an extremely bitter falling out over her abrupt termination from ICP in 2003. (Tr. 778–82.) Ms. Kutskel denied holding a grudge or continuing to be angry due to this falling out. (Tr. 785, 814–15.) But that denial was completely undercut by Ms. Kutskel's demeanor, which alternated between sharp and tearful while testifying, and made clear to the Court that the more than eight years between her severance from ICP and her testimony had not resolved her ongoing anger and sadness toward Mr. Raybuck. (Tr. 780–82, 800–05.) Secondly, and perhaps more importantly, the Court

finds that Ms. Kutskel did not make precise distinctions between the terms butter, margarine, and white sauce in a manner according with the precise ways those terms are understood within Customs law. This sort of slipping from precise to casual terminology by Ms. Kutskel in regard to white sauce is exemplified by a portion of her testimony in which she admitted that she had freely intermixed the terms butter and margarine when interviewed by a investigator from the Department of Homeland Security Immigration and Customs Enforcement Bureau. (Tr. 794–97.) Due to this tendency toward imprecise use of language and paraphrasing, the Court finds Ms. Kutskel's testimony about butter and white sauce unreliable in resolving the legal issues at hand.

The Court has already found that the white sauce in the Entry conformed with the Ruling Letter by containing xanthan gum and CMC in functional amounts and milkfat within the typical range described in the Ruling Letter. Consistent with those findings, the Court finds no evidence in the record establishing that ICP removed any non-milkfat ingredients from its white sauce.

As to minimizing non-milkfat ingredients in white sauce, the government makes much of a specification sheet ICP provided to Schreiber on which the ingredients xanthan gum and CMC are not listed. The government suggested, but did not demonstrate, that ICP removed these ingredients from the white sauce entirely. However, the Court credits Mr. Raybuck's testimony that he consulted ICP's then-attorney, Mr. Heron (*see supra*, p. 1339) and as a result believed that the FDA did not object to removing CMC and xanthan gum from the Schreiber specification sheets on the ground that they were present in small enough quantities that they need not be

mentioned for labeling purposes. (Tr. 94–98.)

There is no credible evidence on the record from which the Court could conclude that removing CMC and xanthan gum on a specification sheet for FDA labeling purposes had any material relevance to the classification decision. Although Dr. Bradley testified to the effect that CMC and xanthan gum were present in such small quantities as not to be functional, this testimony is unpersuasive and outside Dr. Bradley's expert competence as the Court has previously indicated. (Tr. 944, 950–55.)

In any case, the Court finds that Schreiber's request to remove references to CMC and xanthan gum from specification sheets was made shortly before October 5, 1999, and thus post-dated the Ruling Request and could not have been anticipated and disclosed at the time the request was submitted. (Tr. 94–95.)

The Court has already found that the milkfat content of white sauce remained between the 72% and 77% described in the specification sheet included with the Ruling Request—a finding that runs counter to the government's suggestion that ICP attempted to maximize the milkfat content of white sauce. The government's view is also inconsistent with the testimony of Mr. Hopard, who testified that the exact quantity of fat in the white sauce, whether derived from milk or another source, was not necessary for conformance with the Ruling Letter. (Tr. 507.) Additionally, Mr. Hopard testified that "[i]ngredients for sauces are very, very varied" and can range "all over the lot" and still be classified as a sauce preparation. (Tr. 564.) From this, the Court finds that ICP could have simply submitted a request for white sauce to include more milkfat in the first place, rather than obtaining a ruling for a lower amount and later surreptitiously increasing it by as little as 1%. To do so would simply make no sense.

## V. POST-TRIAL SUBMISSIONS

Following the trial, the parties agreed to forego closing arguments and, in their stead, to provide the Court with Proposed Findings of Fact and Conclusions of Law. These were submitted on April 5, 2012 (Court No. 07–00318, ECF No. 250, by Plaintiff, and Court No. 07–00318, ECF No. 251, by Defendant).

Thereafter, on June 6, 2012, the Court sent a letter requesting that the parties provide briefs addressing the following issues: the manner of determining to which class and kind of good a particular piece of merchandise belongs; classification of merchandise under a principal use provision where (a) the product is used commercially but has never previously been offered for sale, and (b) the product is a new type of merchandise; the effect of evolution in the principal use of a class or kind of merchandise on a binding ruling letter issued prior to that change; and the legal status of an interpretive ruling or decision which effectively results in retroactive and prospective refusal by Customs to abide by a binding ruling letter when that interpretive ruling or decision is issued without the notice and comment procedures required by 19 U.S.C. § 1625(c)(1). (Letter Concerning Post-Trial Briefs, Court No. 07–00318, ECF No. 253.)

The parties submitted their briefs on June 27, 2012 (Court No. 07–00318, ECF No. 255, by Plaintiff ("Pl.'s Post–Trial Brief"), and ECF No. 254, by Defendant ("Def.'s Post–Trial Brief")). On July 2, 2012, Defendant moved to strike certain portions of Plaintiff's Post–Trial Brief. (Def.'s Mot. to Strike, Court No. 07–00318, ECF No. 256.) Plaintiff filed an opposition on July 23, 2012. (Court No. 07–

00318, ECF No. 257.) Defendant's Motion to Strike remains pending before the Court at this time.

## VI. CONCLUSIONS OF LAW

### A. Jurisdiction and Standard of Review

The Court has jurisdiction over Plaintiff's challenge to the liquidation of the Entry underlying this case pursuant to 28 U.S.C. § 1581(a). In such a case, the Court makes its determination *de novo* upon "the basis of the record made before the court." 28 U.S.C. § 2640(a); *Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 924 (Fed.Cir.2003) (stating that the Court decides "civil actions that contest the denial of a protest" on "a de novo basis.")

### B. Conclusions of Law

The Court now turns to legal conclusions that stem from the facts established in the Court's findings. There are four main legal issues before the Court. First, the Court must determine whether the Ruling Letter was void *ab initio* and therefore not binding on Customs. Second, the Court must determine whether the Ruling Letter, if valid, applied to the Entry. Third, the Court must determine whether the Notice of Action violated 19 U.S.C. § 1625(c)(1) by effectively revoking the Ruling Letter with regard to the Entry without first satisfying the notice and comment procedures specified in the statute. Fourth, the Court must determine whether Plaintiff is entitled to a remedy and, if so, the nature of that remedy.

#### 1. *The Ruling Letter Was Not Void Ab Initio*

■ The Court concludes that the Ruling Letter was not void *ab initio* as the Court has found as a matter of fact that it was not obtained by material misstatement or omission.

This issue arises from the CBP regulations that set forth what to include in classification ruling requests and how Customs is to make its determinations in response. The regulations state that, "generally," "[e]ach request for a ruling must contain a complete statement of all relevant facts relating to the transaction" and the "transaction to which the ruling request relates must be described in sufficient detail to permit the proper application of relevant customs and related laws." 19 C.F.R. § 177.2(b)(1)–(2)(i). Specifically with regard to ruling requests seeking the proper HTSUS classification of an import,

> the request for a ruling should include a full and complete description of the article and whenever germane to the proper classification of the article, information as to the article's chief use in the United States, its commercial, common, or technical designation, and, where the article is composed of two or more materials, the relative quantity (by weight and by volume) and value of each.

*Id.* § 177.2(b)(2)(ii)(A). In addition, ruling requests

> must state whether, to the knowledge of the person submitting the request, the same transaction, or one identical to it, has ever been considered, or is currently being considered by any Customs Service office or whether, to the knowledge of the person submitting the request, the issues involved have ever been considered, or are currently being considered, by the United States Court of International Trade, the United States Court of Appeals for the Federal Circuit, or any court of appeal therefrom.

*Id.* § 177.2(b)(5). As for how Customs decides such requests, CBP regulations provide that Customs ruling letters are "[g]enerally"

> issued on the assumption that all of the information furnished in connection with

the ruling request and incorporated in the ruling letter, either directly, by reference, or by implication, is accurate and complete in every material respect.... ▇f the transaction described in the ruling letter and the actual transaction are the same, and any and all conditions set forth in the ruling letter have been satisfied, the ruling will be applied to the transaction.

*Id.* § 177.9(b)(1).

The Court has already found that ICP submitted the necessary material facts regarding white sauce—accompanied by an actual sample of the product—to Customs when seeking the Ruling Letter. ICP also informed Customs of its belief that a prior ruling letter had been issued for white sauce, as required by § 177.2(b)(5).

The Court therefore concludes that ICP correctly followed the ruling request procedures set out in section 177.2 of Title 19 of the Code of Federal Regulations, and that the Ruling Letter issued by CBP was not void *ab initio*.

### 2. The Ruling Letter Applied to the Entry

▇ The Court concludes that the Ruling Letter applied to the Entry because the white sauce contained in the Entry materially conformed to the description in the Ruling Letter.

Ruling letters, when issued, apply to a particular class of merchandise:

[e]ach ruling letter setting forth the proper classification of an article ... will be applied only with respect to transactions involving articles identical to the sample submitted with the ruling request or to articles whose description is identical to the description set forth in the ruling letter.

*Id.* § 177.9(b)(2).

The Court has found that the white sauce contained in the Entry conformed to the product described in the Ruling Letter and to the sample of white sauce provided to Customs with the Ruling Request, and was therefore within the particular class of merchandise to which the Ruling Letter applied. The Court therefore concludes that Customs violated its own regulation at 19 C.F.R. § 177.2(b)(2) when it decided not to apply the Ruling Letter to the Entry, despite the conformance of the Entry.

### 3. The Notice of Action in Effect Revoked the Ruling Letter Contrary to Law

▇ The Court concludes that the Notice of Action was tantamount to an interpretive ruling issued contrary to law, as it had the effect of revoking the Ruling Letter without the notice and comment procedures required by 19 U.S.C. § 1625(c)(1) by liquidating the Entry under a different HTSUS subheading than specified in the Ruling Letter.

The Court has already held that the Notice of Action was an "interpretive ruling or decision" within the meaning of 19 U.S.C. § 1625(c)(1) and that, subject to proof at trial, Customs effectively revoked the Ruling Letter contrary to law by "its conduct in connection with the white sauce importations." *ICP III*, 549 F.Supp.2d at 1393–94. The Court here reaffirms this earlier determination and fully incorporates it into the current opinion. Having found that Customs rate-advanced the Entry without following the procedures required by 19 U.S.C. § 1625(c)(1), the Court concludes that Customs acted unlawfully.

### 4. Plaintiff Is Entitled to a Remedy

▇ As to the question of the appropriate remedy, the Court concludes that Plaintiff is entitled to: (1) a declaration that the liquidation of the Entry contrary to 19 U.S.C. § 1625(c)(1) is void; and (2) a judgment requiring Customs to reliquidate the Entry at the rate specified in the

Ruling Letter and refund any excess duties to ICP with interest.

It is important 'be mindful that the Court is not called on here to determine the proper classification of ICP's white sauce *de novo*. The Court is instead faced with the question of whether Customs violated ICP's right to notice and comment procedures, contained in 19 U.S.C. § 1625(c)(1), when Customs refused to apply a lawfully-obtained, applicable Ruling Letter to the Entry. Because the Court has determined that Customs violated its legal obligation to classify the Entry according to the Ruling Letter, the appropriate remedy is one tailored to cure that breach of law. It is thus appropriate to declare Customs's rate-advance of the Entry to be void, and to require that Customs apply the Ruling Letter to the Entry as it should have done initially. This can be accomplished by requiring Commerce to reliquidate the Entry at the rate specified in the Ruling Letter and to refund any overpayments, along with interest covering the time of ICP's overpayment to the time the Court's judgment is satisfied.

## VII. Remaining Issues

Several minor issues remain: Plaintiff's motion seeking an adverse inference based on Defendant's alleged spoliation of a white sauce sample; Defendant's motion to disqualify Plaintiff's counsel; and Defendant's motion to strike certain portions of Plaintiff's Post–Trial Brief.

First, The Court need not reach the questions of whether Defendant spoliated evidence or whether Plaintiff would be entitled to an adverse inference on that basis, as the Court has concluded as a factual matter that the white sauce in the entry materially conformed to the Ruling Letter on the basis of the trial record. An adverse inference is therefore unnecessary, and Plaintiff's motion is denied as moot.

Similarly, Defendant's motion to disqualify Plaintiff's counsel is denied as moot, as

Mr. Teufel did not testify or ask to testify at trial.

Finally, Defendant's motion to strike certain portions of Plaintiff's Post–Trial Brief is granted. In its Post–Trial Brief, Plaintiff referenced certain purported evidence that Plaintiff attempted to introduce at trial and which the Court excluded by sustaining an evidentiary objection from Defendant. As such, these purported facts were not in evidence and cannot be considered by the Court. The Court therefore strikes the references to these matters from page 9 of Plaintiff's Post–Trial Brief, and has ignored this text in issuing this decision.

## VIII. Conclusion

For the foregoing reasons, the Court determines that: (a) the Ruling Letter was not obtained by material misrepresentation; (b) the Ruling Letter was therefore valid and binding on Customs at the time of the Entry; (c) the white sauce in the Entry materially conformed to the Ruling Letter; (d) Customs improperly liquidated the white sauce contrary to the Ruling Letter by means of the Notice of Action; (e) the Notice of Action had the effect of unlawfully revoking the Ruling Letter contrary to the requirements imposed by 19 U.S.C. § 1625(c)(1), and (f) Plaintiff is therefore entitled to reliquidation of the Entry at the rate established by the Ruling Letter.

Pursuant to USCIT Rule 54(b), "[w]hen an action presents more than one claim for relief ... the court may direct entry of a final judgment as to one or more, but fewer than all, claims ... only if the court expressly determines that there is no just reason for delay." The Court determines that Plaintiff is entitled to all of the relief it seeks based on the outcome of its 19 U.S.C. § 1625(c)(1) claim, and that there is thus no just reason to delay entry of judgment.

Because the Court finds that Plaintiff is entitled to full relief based on its 19 U.S.C. § 1625(c)(1) claim, the Court need not reach Plaintiff's due process claim or bifurcated 19 U.S.C. § 1625(c)(2) "prior treatment" claim at this time. Those claims remain dormant pending the outcome of any appeals. Should the Court's judgment on the 19 U.S.C. § 1625(c)(1) claim be disturbed, Plaintiff may seek further relief on its other claims as appropriate.

Final judgment on the 19 U.S.C. § 1625(c)(1) claim will issue accordingly.

In accordance with the foregoing, it is hereby

**ORDERED** that Plaintiff's motion for an adverse inference based on spoliation of evidence is denied as moot;

**ORDERED** that Defendant's motion to disqualify Plaintiff's counsel is denied as moot; and it is further

**ORDERED** that Defendant's Motion to Strike portions of Plaintiff's Post–Trial Brief is granted.